**Francisco VELOZ, Plaintiff,**

v.

**State of NEW YORK, et al., Defendants.**

**No. 02 Civ. 7070(SHS).**

United States District Court, S.D. New York.

Sept. 30, 2004.

510

**OPINION & ORDER**

STEIN, District Judge.

Francisco Veloz brings this action *pro se* pursuant to 42 U.S.C. § 1983 alleging that defendants violated his constitutional right under the Eighth Amendment to the U.S. Constitution to be free from cruel and unusual punishment. His allegations arise out of the treatment he received for a spinal condition while incarcerated at Green Haven Correctional Facility. Specifically, Veloz alleges defendants failed to provide adequate medical care for his condition for more than eight years. He also alleges that the operation that was eventually performed to improve his condition actually worsened his condition and caused him to lose feeling from the waist down and to have severe bladder problems. Plaintiff alleges he suffered a physical disability as a result of this operation, and that defendants failed to adequately accommodate his condition by placing him in an unsanitary cell that leaked black water rather than place him in the Unit for the Physically Disabled ("UPD"). Plaintiff further contends that the reason behind defendants' decision to refuse him placement in the UPD was his disability, in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12132, and his race—he claims he is "Spanish"—in violation of the Fourteenth Amendment's Equal Protection Clause. Veloz contends that these factors—his disability and race—also influenced defendants' decision to refuse to place him in Green Haven's Honor Block, apparently a preferred housing assignment.[1] Veloz further alleges that defendants denied him medical attention for sixty-nine days for an injured right wrist, and never provided him medical care for an injury to his left shoulder. Finally,

Francisco Veloz, Wyoming Correctional Facility, Attica, NY, Pro se.

Benjamin J. Lee, Assistant Attorney General, Eliot Spitzer, Jerry Slater, Attorney General of New York, New York City, for Defendants.

1. Plaintiff, however, does allege at some points that Honor Block has "nothing to do with" the ADA "because the Honor Block is much different" than the UPD. (Pl.'s Stmt. ¶ 8.)

he alleges defendants moved him from his cell and placed him in the prison gym for extended periods of time without providing him a private place to change his adult diaper while female correctional officers patrolled, in violation of the Eighth Amendment's cruel and unusual punishment clause.

Defendants the State of New York, Department of Correctional Services of the State of New York ("DOCS"), Dr. John Galeno—the doctor who performed surgery on Veloz—and seven individuals associated with DOCS—Christopher Artuz, Charles Greiner, Lawrence Zwillinger, Carl Joseph Koenigsmann, Sabrina Kaplan, Corrections Sergeant Goodman and Corrections Officer C. Butenhoff—now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the grounds that: (1) plaintiff has failed to exhaust his administrative remedies for at least six of the eight claims as required by the Prison Litigation Reform Act of 1995, as amended, 42 U.S.C. § 1997e(a); (2) plaintiff has failed to exhaust his ADA claims with the United States Department of Justice; (3) plaintiff has failed to allege facts to support his contention that the delay in treatment for his spine, left shoulder, and right wrist resulted in any adverse medical effects, or that Dr. Galeno performed the spine operation with deliberate indifference that caused detrimental effect; (4) defendants Zwillinger, Koenigsmann and Kaplan were not personally involved in the alleged constitutional deprivations; (5) all the individual defendants are entitled to qualified immunity; and (6) this Court lacks jurisdiction over the subject matter of this action under the Eleventh Amendment.[2] For the reasons set forth, the motion is granted.

## I. *The Standard for Summary Judgment*

Summary judgment will be granted only when the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (quoting Fed.R.Civ.P. 56(c)). The moving party must demonstrate "the absence of a genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (internal quotations and citation omitted). To survive a summary judgment motion, the non-moving party must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Id.; see* Fed. R.Civ.P. 56(e). In determining whether summary judgment is appropriate, the district court " 'must view the evidence in light most favorable to the non-moving party and draw all reasonable inferences in its favor.' " *American Cas. Co. of Reading, Pa. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir.1994) (quoting *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir.1993)). A grant of summary judgment is appropriate when no rational jury could find in favor of the non-moving party because there is no genuine issue of material fact based on the evidence in the record or the substantive law. *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir.1994).

**2.** On January 5, 2004, plaintiff filed a "Reply Brief Memorandum of Law in Opposition of Defendants Motion for Summary Judgment," in response to defendant's Reply. On January 8, 2004, defendants requested that this "Reply Brief" be rejected as plaintiff had not been given permission to file a sur-reply or, in the alternative, that defendants be permitted to further brief the issues raised in the sur-reply. As the issues raised in plaintiff's sur-reply fail to cure the deficiencies that warrant the dismissal of his amended complaint, there is no need for defendants to brief these issues further.

■ Furthermore, where, as here, a party is proceeding *pro se*, a Court must read the *pro se* litigant's supporting papers liberally and interpret them " 'to raise the strongest arguments that they suggest.' " *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994)). The application of this liberal standard does not, however, "relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir.2003).

## II. *Exhaustion of Administrative Remedies*

### A. *Exhaustion within DOCS' grievance system*

■ The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002), the United States Supreme Court held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or some other wrong." In its statutory analysis of the PLRA, the Supreme Court held in *Booth v. Churner*, 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001), that exhaustion of administrative remedies is required regardless of the relief offered. *Id.* at 740–41, 121 S.Ct. at 1824–25. *Porter* mandates that every claim asserted by a prisoner must be grieved administratively prior to seeking judicial relief. *Fields v. Brown*, No. 02 Civ. 1178, 2002 WL 31202763, at *3 (S.D.N.Y. Oct.1, 2002).

■ The failure to exhaust available administrative remedies is an affirmative defense that may be waived if not raised. *Johnson v. Testman*, 380 F.3d 691, 696 (2d Cir.2004). It is also subject to estoppel. *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir.2004). When, as here, defendants raise this issue of exhaustion as a defense and plaintiff provides a plausible argument to counter their position, the Second Circuit has suggested that district courts follow a three-step inquiry. *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir.2004). First, courts must determine "whether administrative remedies were in fact 'available' to the prisoner." *Id.* (citing *Abney v. McGinnis*, 380 F.3d 663 (2d Cir.2004)). Administrative remedies may be considered unavailable in cases where an inmate receives a favorable ruling through the administrative process and the prison system fails to implement the suggested remedy. *Abney*, 380 F.3d at 668–69. Since the administrative process does not provide a mechanism for appealing "implementation failures," and therefore no administrative remedy is available, prisoners in such a case have fully exhausted their administrative remedies. *Id.* at 669. Second, courts should inquire whether defendants waived the failure to exhaust this defense by not raising or preserving it, *Hemphill*, 380 F.3d at 686 (citing *Johnson*, 380 F.3d at 696), or whether defendants are estopped from raising this defense based on their own behavior, such as inhibiting an inmate from grieving. *Id.* (citing *Ziemba*, 366 F.3d at 163). Finally, courts should consider any " 'special circumstances' " that may justify a prisoner's failure to exhaust remedies. *Id.* (quoting *Giano v. Goord*, 380 F.3d 670 (2d Cir.2004)).

■ New York State's Inmate Grievance Procedure ("IGP") has established a three-step inmate grievance process available to prisoners to exhaust their adminis-

trative remedies. *See* N.Y. Correct. Law § 139; N.Y. Comp.Codes R. & Regs. tit. 7, § 701. Generally, the regulations require that an inmate first file a complaint with the inmate grievance resolution committee ("IGRC") within fourteen days of the alleged event. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7(a)(1). The IGRC must then investigate and resolve the complaint informally within seven days. *Id.* at § 701.7(a)(3). If there is no informal resolution, a hearing is held, and the inmate may appeal the result to the Superintendent of the facility within four days of receiving it. *Id.* at §§ 701.7(a)(4), (b). Finally, the inmate must appeal the Superintendent's decision to the Central Office Review Committee ("CORC") within four days of its receipt. *Id.* at § 701.7(c). The CORC, in turn, must render a decision within twenty days. *Id.* Complete exhaustion of the above administrative remedies through the highest level for each claim is required. *Fields,* 2002 WL 31202763, at *2–3 (section 1983 complaint dismissed for failure to exhaust when plaintiff failed to appeal the grievance to the CORC); *see Santiago v. Meinsen,* 89 F.Supp.2d 435 (S.D.N.Y.2000). An inmate may only pursue an action in federal court after exhausting "any available administrative remedies, including all appellate remedies provided." *Waters v. Schneider,* No. 01 Civ. 5217, 2002 WL 727025, at *1 (S.D.N.Y. Apr.23, 2002) (citing *Fletcher v. Haase,* No. 99 Civ. 9549, 2002 WL 313799 (S.D.N.Y. Feb.27, 2002)); *see also Webb v. Goord,* 192 F.Supp.2d 208, 211 (S.D.N.Y. 2002).

Defendants contend that Veloz failed to exhaust the following claims according to the grievance procedure afforded to inmates at Green Haven: (1) deliberate indifference to his left shoulder injury; (2) violation of plaintiff's Eighth Amendment rights by housing him in a cell with a black water leak; (3) violation of plaintiff's Eighth Amendment rights and racial discrimination by housing him in a gym on two separate occasions; (4) deliberate indifference and racial discrimination as to treatment of plaintiff's right wrist; and (5) discrimination against plaintiff based on his race and disability by denying his application for the Honor Block.

Veloz contends that he did, in fact, exhaust his administrative remedies by placing grievances in the mail but that his grievances were either misplaced or destroyed. He further contends that since he does not maintain any control over the 15 to 20 different grievances he filed, he does not know which claims were received by the grievance committee and which ones were destroyed. In fact, Veloz contends he filed a grievance regarding the alleged destruction of grievances by DOCS officers, but this grievance was never set for a hearing. (Pl.'s Reply Brief at 1–2 & Ex. B.) Defendants allege that the grievances concerning Honor Block, the injury to his right wrist, the transfer to the gym on two occasions, and his placement in a cell with a black water leak, do not have the signature of the grievance clerk, a date stamp indicating when the grievance clerk received these grievances, or any other proof on the face of the forms evidencing the filing of these grievances by plaintiff. (Letter from Lee to the Court dated 1/8/04, at 1–2.) Defendants further argue that even assuming Veloz did file these grievances, he failed to appeal any of these claims to the next level. (*Id.*)

### B. *Plaintiff's several grievances*

The record includes references to a number of grievances submitted by Veloz during his incarceration, but the Court will deal only with those relevant to the issues raised here. As to plaintiff's medical condition, he alleges he submitted a grievance on September 16, 1996 for poor medical

treatment and requested an operation to ease his pain, but that no action was taken by the IGRC. (Pl.'s Reply Brief at 2.) On May 21, 1997, plaintiff filed a grievance (GH–37540) claiming he had not received proper medical care. (Lee Decl. Ex. B.) As a result of this grievance, plaintiff was given another evaluation. (*Id.*) On March 2, 1999, plaintiff had an operation. On March 5, 2001, plaintiff filed a grievance (GH–46316) requesting a new spine operation because of the pain and complications he experienced after his March 1999 operation. (Pl.'s Aff. Ex. B.) Since a neurologist who treated Veloz on February 26, 2001, did not recommend any follow-up, a new operation was not ordered but he was instructed to discuss medical concerns with his primary physician. (*Id.*) He appealed this decision, which was denied because evidence of his numerous visits with medical staff warranted the conclusion that he had received appropriate care.[3] (*Id.*)

With respect to plaintiff's request to be housed in the UPD, he alleges he filed a grievance on an unidentified date, but it was denied. (Pl.'s Reply Brief at 4.) He further claims that he attempted to appeal this denial to defendant Masterson—the ADA coordinator at Green Haven—who allegedly signed a "declaration against plaintiff," and failed to provide plaintiff a copy to enable him to appeal the initial decision. (*Id.*) Plaintiff alleges he filed a second grievance on December 23, 2000 but that no action was taken. (*Id.* at 3 & Ex. H.) A third grievance (GH–51455) was filed on June 3, 2003, requesting a transfer to the UPD. (Lee Decl. Ex. B; Eagen Decl. Ex. A.) The denial of this grievance was appealed on August 28, 2003. (*Id.*) The record does not reveal if a decision was rendered on this appeal. As for plain-

tiff's fourth grievance regarding transfer to the UPD, filed on August 28, 2003 at Livingston Correctional Facility, the record does not indicate the decision rendered or if an appeal was taken.

Plaintiff's request for transfer to the Honor Block was the subject of a January 9, 1996 grievance, but plaintiff alleges no action was taken on this grievance. (Pl.'s Reply Brief at 2 & Ex. C.) He alleges he submitted a grievance on July 24, 2001 regarding the black water leak in his cell, but no action was taken on that grievance either. (*Id.* at Ex. I.) In the July 24, 2001 grievance, plaintiff also raised his claim about the alleged injury to his right wrist, but no action was taken. (*Id.*) He alleges he filed three separate grievances in December of 1999 concerning his transfer from his cell to a gym on two separate occasions. (Pl.'s Stmt. ¶ 4; Pl.'s Reply Brief at 3 & Exs. F–G.) He also filed a claim regarding property that was damaged during his transfer to the gym. (Pl.'s Stmt. ¶ 4.) Finally, he offers no evidence or allegations regarding a grievance concerning the injury to his shoulder.

### C. *Were DOCS' administrative remedies available to plaintiff?*

 As an initial matter, administrative remedies were "available" to plaintiff "at the outset; that is, the prison provided grievance procedures that inmates … could utilize." *Hemphill*, 380 F.3d at 686; *see O'Connor v. Featherston*, No. 01 Civ. 3251, 2002 WL 818085, at *2 (S.D.N.Y. Apr. 29, 2002) (prisoners may be excused from fully exhausting administrative remedies when those remedies are not "available"). But that does not end the inquiry. When an inmate's reasonable attempts to exhaust available administrative remedies

---

**3.** A third fully exhausted grievance was filed by plaintiff in 1999; however, the record is unclear if this request was for back pain relat-

ing to his spinal condition or for foot pain. (Eagen Decl. Ex. A.)

are impeded by a correctional officer, the remedy may be deemed unavailable, thereby excusing the inmate from technically exhausting his remedies. *See, e.g., Palmer. v. Goss,* No. 02 Civ. 5804, 2003 WL 22327110 (S.D.N.Y. Oct.10, 2003) (inmate who did not appeal a superintendent's decision when evidence favorable to the inmate's appeal was destroyed by hearing officer survived summary judgment motion); *O'Connor,* 2002 WL 818085, at *2 (inmate who was told by correctional officer to follow-up his claims through the Inspector General's Office rather than through the proper grievance procedure survived motion to dismiss complaint for failure to exhaust); *Feliciano v. Goord,* No. 97 Civ. 263, 1998 WL 436358, *2 (S.D.N.Y. June 27, 1998) (inmate who complained to a sergeant about an assault, told the matter was not a grievance matter but a security matter, denied grievance forms, and assured the matter would be investigated, survived motion to dismiss complaint for failure to exhaust). An inmate seeking to be relieved from technically exhausting his administrative remedies must allege facts showing that he made reasonable attempts to exhaust his remedies. *See Nunez v. Goord,* 172 F.Supp.2d 417, 428–29 (S.D.N.Y.2001) (inmate's unsupported claims that his grievances were lost at the Grievance Committee Office or destroyed by officers thereby rendering his attempts to grieve futile, fails to excuse inmate from fully grieving remedies).

▮ Drawing all inferences in plaintiff's favor, the Court concludes that plaintiff failed to make reasonable attempts to fully exhaust his available administrative remedies as to his claims regarding his injury to his right wrist, his injury to his left shoulder, his placement in a cell with a black water leak, his transfer to the prison gym for an extended period of time on two separate occasions, and his denial to be transferred to the Honor Block. First, there is no evidence whatsoever that any of these grievances were filed with a grievance clerk: the signature of a grievance officer is not on any of the forms and there is no indication in the record that the grievance officer received any of the forms. Even assuming Veloz did submit the grievances, he offers no evidence that any particular officer thwarted his attempts to file; he simply contends that the practice of destroying or misplacing grievances must have been the cause of his grievances being lost. His allegations "stand alone and unsupported." *Nunez,* 172 F.Supp.2d at 429. Third, plaintiff's allegation that these particular grievances were misplaced or destroyed by correctional officers ultimately does not relieve him of the requirement to appeal these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming. *See Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) (inmate who allegedly received no response to grievance "could have and should have appealed grievance in accordance with grievance procedure"); *Waters,* 2002 WL 727025, at *1 (same).

Plaintiff was most assuredly keenly aware of the grievance process, as he previously exhausted other claims to the highest level. (Lee Decl. Ex. B.) For the claims raised here, however, he does not offer any evidence that he appealed his grievances or that his attempt to do so was impeded in any way. (Pl.'s Reply Brief at 1–2.) Nor does he offer any evidence as to why he did not fully exhaust the unexhausted claims. *Nunez,* 172 F.Supp.2d at 428. Accordingly, since plaintiff fails to allege that he fully exhausted any of these claims or that his reasonable attempts to exhaust were impeded by any particular officer, defendants' motion with respect to plaintiff's claims regarding the injury to his right wrist, his placement in a cell with

a black water leak, his transfer to the prison gym for an extended period of time on two separate occasions, and his denial to the Honor Block, is granted. In addition, as plaintiff fails to offer any allegations regarding exhaustion of his claim with respect to the injury to his left shoulder, defendants' motion with regard to this claim is also granted. Therefore, the claims against defendants Sabrina Kaplan, Corrections Sergeant Goodman and Corrections Officer C. Butenhoff, the individuals allegedly responsible for violating plaintiff's constitutional rights with respect to these claims, are dismissed.

## D. *Exhaustion requirement for ADA claim*

Plaintiff alleges he was denied placement in UPD housing on account of his race and disability in violation of the ADA. Defendants contend that Veloz failed to exhaust this claim with the United States Department of Justice ("DOJ"), which provides a grievance procedure for those claiming a violation of the ADA. Veloz responds that he did grieve his ADA claim when he wrote a letter in 2001 to the DOJ agency that handles such claims.[4] (Pl.'s Stmt.¶ 7.) He also states that he never heard back from the DOJ regarding this grievance. (*Id.*) Based on plaintiff's own statements it is clear that he did not fully exhaust the DOJ's administrative remedy for ADA claims. *See* 28 C.F.R. §§ 35.170–35.178 (describing administrative procedures for resolving ADA complaints).

▇▇▇▇ Defendants contend that the entire claim should be dismissed despite Veloz's allegations that he fully exhausted the claim within the internal grievance procedure because the PLRA requires exhaustion of plaintiff's ADA claim with the

DOJ as well as with DOCS. As an initial matter, since plaintiff not only bases his claim on a violation of the ADA, but also on a violation of the Fourteenth Amendment's Equal Protection Clause—a claim that clearly need not be exhausted with the DOJ—the entire claim cannot be dismissed on the ground of failure to exhaust with the DOJ. *See Ortiz v. McBride*, 380 F.3d 649 (2d Cir.2004) (mixed action asserting both exhausted claims and unexhausted claims not required to be dismissed in its entirety). Whether plaintiff was required to exhaust his ADA claim within the DOJ as well as within the prison system is another question. As explained below, this Court concludes that plaintiff is not required to file grievances both internally with DOCS and externally with the DOJ.

▇▇▇▇ Under Title II of the ADA, the United States Attorney General and the DOJ promulgated an administrative process for disabled individuals alleging discrimination in services. *See* 42 U.S.C. § 12134(a). This grievance procedure is voluntary and individuals opting for a private suit need not exhaust with the DOJ prior to filing a federal claim. *Shariff v. Artuz*, No. 99 Civ. 0321, 2000 WL 1219381 (S.D.N.Y. Aug.28, 2000) (citing 28 C.F.R. § 35.172, App. A) ("Because the [ADA] does not require exhaustion of administrative remedies, the complainant may elect to proceed with a private suit at any time.") (internal quotations omitted). Federal prisoners interested in grieving their claims with the DOJ must exhaust their administrative remedies through the Bureau of Prisons ("BOP") prior to bringing a complaint to the DOJ. *See* 28 C.F.R. § 39.170(d)(1)(ii); *Burgess v. Goord*, No.

---

4. Plaintiff sent his letter to the Civil Rights Division of the DOJ, which is the division that handles ADA grievances.

98 Civ.2077, 1999 WL 33458, *7 n. 6 (Jan. 26, 1999) (citing *Funches v. Reish*, No. 97 Civ. 7611, 1998 WL 695904 (S.D.N.Y. Oct. 5, 1998)). As for state inmates, the ADA makes no mention of exhaustion requirements prior to filing a grievance with the DOJ. *See* 28 C.F.R. § 39.170(d)(1) (regulations requiring federal inmates to exhaust with the Bureau of Prisons prior to filing a claim with the DOJ silent as to state inmates).

Defendants contend that although the *ADA* may not require state inmates alleging an ADA violation to exhaust their grievance with the DOJ, this remedy is "available" within the meaning of the PLRA, and therefore must be exhausted pursuant to the *PLRA. See e.g. Rosario v. New York State Dep't Corr. Servs.*, No. 03 Civ. 859, 2003 WL 22429271, at *4 (S.D.N.Y. Sept.24, 2003); *Burgess v. Garvin*, No. 01 Civ. 10994, 2003 WL 21983006, at *3 (S.D.N.Y. Aug.19, 2003) (in dismissing an inmate's ADA claim for failure to exhaust with the DOJ, the Court held that the PLRA's "plain language and manifest intention is to require prisoners to exhaust whatever administrative remedies 'are available' ").

In this district, several courts have agreed with defendants' contention and dismissed ADA claims for failure to exhaust them with the DOJ. *See, e.g., Burgess*, 2003 WL 21983006; *Rosario*, 2003 WL 22429271. Other courts have agreed with the conclusion that prisoners need not exhaust with the DOJ, since Title II of the ADA does not require exhaustion prior to filing a federal suit. *See Singleton v. Perilli*, No. 03 Civ. 2271, 2004 WL 74238, at *4 (S.D.N.Y. Jan.16, 2004); *Shariff v. Artuz*, No. 99 Civ. 0321, 2000 WL 1219381, at *3 (S.D.N.Y. Aug.28, 2000) (inmates not required to exhaust under the ADA since the ADA does not require exhaustion prior to filing a federal action).

The Supreme Court's holding in *Porter v. Nussle*, that prisoners must fully exhaust all available administrative remedies, clarified Congress' purpose in its enactment of the PLRA to "reduce the quantity and improve the quality of prisoner suits." *Porter*, 534 U.S. at 525, 122 S.Ct. at 988. In analyzing Congress' decision to enact the PLRA, the Court determined that Congress' interest was in "afford[ing] corrections officials time and opportunity to address complaints *internally* before allowing the initiation of a federal case." *Id.* (emphasis added). The Court stated that Congress trusted the "the internal review" to " 'filter out some frivolous claims,' " *id.* (citing *Booth*, 532 U.S. at 737, 121 S.Ct. at 1823) (emphasis added), and that the exhaustion requirement would encourage corrective action on the part of correctional officers in response to internal grievances, and avoid litigation. *See id.*

On its face, and with a strict reading, defendants' contention is reasonable; *Porter* dictates that all available remedies be exhausted. The result of such a reading, however, is inconsistent with the purpose of the PLRA as explained in *Porter.* Congress's desire "to afford *corrections officials* the opportunity to address complaints internally . . . is inconsistent with a rule requiring exhaustion of a remedy which is outside the prison and which does not involve prison authorities." *Handberry v. Thompson*, No. 96 Civ. 6161, 2003 WL 194205 (S.D.N.Y. Jan. 28, 2003) (emphasis in original) (defense raised that plaintiff failed to exhaust his external administrative remedies provided in New York State's Education Law); *see also Funches*, 1998 WL 695904, at *9 ("strict adherence to PLRA's rule of exhaustion should ultimately lead to improved prison conditions and swifter responses to grievances because inmates will be forced to bring their claims to the attention of *pris-*

*on officials"*) (emphasis added). This analysis of the exhaustion requirement is consistent with *Porter's* mandate that prisoners exhaust their administrative remedies in the prison at which they are incarcerated in order to allow the institution to remedy the alleged violations. Filing a complaint with the DOJ, an external federal agency, does not allow correctional officers to respond directly to inmates' grievances nor does it allow them to remedy the issues raised in the grievance. Requiring prisoners to grieve with external agencies does not serve the underlying purpose of the exhaustion requirement. Accordingly, since plaintiff need not have filed his ADA claim with the DOJ prior to bringing his federal claim, and since he fully exhausted this claim when he filed an appeal with CORC, defendants' motion regarding the exhaustion of remedies as to plaintiff's placement in UPD housing is denied.

### E. *"Total Exhaustion" rule*

■ Although defendants concede that Veloz "arguably fully exhausted" two of his claims (request for a new operation and deliberate indifference to his spine condition), they argue that the entire complaint should be dismissed for failure to exhaust all of his claims. Although at the time defendants filed their motion, there was a split in authority in this Circuit on whether the PLRA requires dismissal of all claims in a so-called "mixed" complaint when some claims are exhausted and some claims are unexhausted, the issue has since been resolved by the Second Circuit in *Ortiz*, 380 F.3d at 651 (presence of an unexhausted claim does not require a district court to dismiss action in its entirety). For the following reasons, however, defendants' motion as to plaintiff's claims regarding his spine condition and his transfer to the UPD are granted.

### III. *Personal Involvement*

■ As a prerequisite to a damage award under 42 U.S.C. § 1983, a plaintiff must allege the defendant's direct or personal involvement in the alleged constitutional deprivation, *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995); *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991), or that a defendant had actual or constructive notice of the deprivation. Since *respondeat superior* cannot provide a basis for liability under section 1983, *see Monell v. Dep't of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999), a defendant may not be held liable merely because he held a high position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

■ The personal involvement of supervisory officials in their individual capacities may be established by evidence that the officials (1) participated directly in the alleged constitutional violation, (2) failed to remedy a wrong after being informed of a violation through a report or appeal, (3) created a policy or custom that sanctioned unconstitutional conduct, or allowed the continuance of such a policy or custom, (4) were grossly negligent in supervising subordinates who committed the alleged violations, or (5) failed to act on information indicating that unconstitutional acts were occurring. *Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)); *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001); *see Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). Some personal responsibility on the part of the officer must be established and "proof of 'linkage in the prison chain of command is' insufficient" to establish liability. *Hernandez,* 341 F.3d at 144–45.

### A. Charles Greiner & Christopher Artuz

■ Veloz fails to allege personal involvement on the part of defendants Christopher Artuz and Charles Greiner as to plaintiff's remaining claims. As there is no evidence or allegation that those defendants violated any of plaintiff's constitutional rights either directly or as a supervisor, nor is there any allegation that those two defendants had knowledge of the alleged violations, defendants' motion regarding the claims against Greiner and Artuz is granted.

### B. Carl Joseph Koenigsmann

■ Veloz alleges that defendant Koenigsmann—the Health Services Director—ordered that plaintiff's wheelchair be removed and denied him access to UPD housing for discriminatory reasons.[5] Plaintiff offers no evidence to show that Koenigsmann participated in the removal of the wheelchair. In fact the entry in the Medical Excuse Permit providing for the removal of the wheelchair makes no mention of Koenigsmann. (Pl.'s Am. Compl., Unmarked Ex., "Medical Excuse Permit".) Moreover, none of plaintiff's other medical records indicate that Koenigsmann participated in that decision, failed to act as others he supervised committed constitutional violations, was placed on notice that Veloz's care was inadequate and failed to remedy that wrong, or that plaintiff ever contacted Koenigsmann regarding his treatment. With *respondeat superior* being the only theory attaching liability to Koenigsmann, claims against this defendant are dismissed for lack of personal involvement. *Hernandez,* 341 F.3d at 144–45; *Colon,* 58 F.3d at 873; *see Benjamin v. Schwartz,* 299 F.Supp.2d 196 (S.D.N.Y.2004) (allegation that supervisor " 'could have' " intervened not sufficient to satisfy personal involvement requirement) (citation omitted).

■ As for Koenigsmann's alleged involvement in denying plaintiff UPD housing for discriminatory reasons, this claim may not be dismissed for failure to allege personal involvement since Koenigsmann is directly and ultimately responsible for determining who is placed in UPD housing. (Koenigsmann's Decl. ¶ 4.) Accordingly, the only allegation that can proceed against Koenigsmann relates to his role in Veloz's request to be placed in UPD housing.

### C. Lawrence Zwillinger

■ Defendants contend that since defendant Zwillinger had no involvement in Veloz's medical care and is not a doctor, but rather an administrator, he cannot be held liable for any alleged violation. Veloz alleges, however, that Zwillinger learned in June of 1992 of a delay in plaintiff's medical care when Zwillinger received a letter from a medical auditor, Dr. Robert L. Cohen, but failed to properly respond to this letter by ordering follow-up care. (Am. Compl. ¶ IV & Ex. A.) In a June 26, 1992 letter, Dr. Cohen expressed his concern that plaintiff had not received an MRI requested on March 11, 1991, and that a neurological consultation requested on March 5, 1992 had also not taken place. Additionally, Dr. Cohen expressed concern that medical personnel took two weeks to provide Veloz with prescribed medication. Given that the letter raised concerns regarding a delay in treating plaintiff's spine and it was addressed to Dr. Zwillinger, the contention that Zwillinger was involved

---

**5.** Plaintiff also alleges that this defendant was deliberately indifferent to his serious medical needs by delaying treatment for a wrist injury for sixty-nine days. This claim, however, is dismissed for failure to grieve this claim within the prison system.

personally is not without merit as this allegation relates to the 1992 letter and the care provided in response to the letter. Other than this discrete time period in 1992, plaintiff offers no evidence of Zwillinger's direct involvement in his care, and any allegations of deliberate indifference outside the 1992 period are dismissed as they relate to Zwillinger.

### IV. Eighth Amendment Standard

As to plaintiff's claim that defendants denied him proper medical treatment for his spinal condition during his 8½ years of incarceration at Green Haven, the Eighth Amendment prohibits the infliction of "cruel and unusual punishment." In order to establish a claim of inadequate medical care in violation of the Eighth Amendment, a prisoner must allege acts or omissions demonstrating " 'deliberate indifference' to a substantial risk of serious harm...." *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1970, 1974, 128 L.Ed.2d 811 (1994) (citation omitted). "Deliberate indifference" to a prisoner's medical need is demonstrated by proof that prison officials "intentionally den[ied,] or delay[ed] access to medical care or intentionally interfer[ed] with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–06, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976).

The "deliberate indifference" standard consists of both an objective and a subjective component. First, the alleged deprivation must be "sufficiently serious that it denies a prisoner 'the minimal civilized measures of life's necessities.' " *Wilson v. Seiter*, 501 U.S. 294, 297–303, 111 S.Ct. 2321, 2323–27, 115 L.Ed.2d 271 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)); *see also Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir.2000). The "sufficiently serious" requirement

" 'contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994) (quoting *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir.1990)). Second, a defendant must act with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834, 114 S.Ct. at 1977; *Hathaway*, 37 F.3d at 66; *see also Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Deliberate indifference exists when a prison official

knows of and disregards an excessive risk to inmate health or safety; the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979; *see Chance*, 143 F.3d at 703.

Negligent treatment or medical malpractice, or a claim based on differences of opinion over matters of medical judgment, are insufficient to state an Eighth Amendment claim. *Estelle*, 429 U.S. at 105–06, 97 S.Ct. at 292; *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir.2000). Rather, the alleged conduct must be such that it is "repugnant to the conscience of mankind" or "incompatible with the evolving standards of decency that mark the progress of a maturing society." ' *Estelle*, 429 U.S. at 102, 105, 97 S.Ct. at 290, 292 (citations omitted). To establish deliberate indifference, plaintiff must demonstrate that the defendants "actually wish[ed] him harm, or at least, [were] totally unconcerned with his welfare." *Hathaway*, 37 F.3d at 69 (internal quotations and citation omitted).

Veloz alleges that from 1991 until he left Green Haven in June of 2003, his doctors, their supervisors and his surgeon, Dr. Galeno, all were deliberately indifferent to his medical needs by failing to provide adequate medication for him to manage his

pain, by delaying surgery until March of 1999, by performing surgery with deliberate indifference, and by refusing to treat plaintiff's medical problems resulting from his surgery. Based on the medical records presented to the Court, and drawing all inferences in plaintiff's favor, the Court concludes that defendants did not treat plaintiff with deliberate indifference as to his medical needs, and defendants' motion for summary judgment should be granted with respect to these claims.

### A. Spinal condition and treatment

Veloz's claims of deliberate indifference to his spinal condition fall within three distinct time periods. First, he alleges that from 1991 until 1999, defendants delayed spinal surgery and failed to provide him with adequate pain medication. Second, he alleges that defendant Galeno performed surgery "without skill" which caused increased pain in Veloz's lower back. Third, he alleges that defendants continued to treat the medical problems that resulted from the surgery with deliberate indifference. The facts that support plaintiff's allegations are drawn primarily from the medical logs and reports attached as exhibits to defendant Koenigsmann's affidavit.

Starting in June of 1991, when plaintiff's first X-ray was taken at Green Haven, defendants learned that Veloz had a mild case of degenerative lumbar spondylosis, a degenerative condition affecting vertebrae, at the L2, L4 and L5 levels, moderate degenerative spondylosis changes in the lower cervical spine C6–C7 levels, and milder degenerative cervical spondylosis at levels C3–C5.[6] (Koenigsmann Decl. Ex. B at 627–28.) When Veloz began to first feel

a "tremendous pain" in his back, sometime in 1991, he complained to the medical department about the pain and was given Tylenol. (Am.Compl. ¶ IV.) He alleges that medical personnel continued to ignore his requests for adequate treatment over the next few months, and that he was told by one administrator, "there is nothing I can do about the pain that you are feeling." (Id.) Veloz interpreted this response as discriminatory and contacted a "federal assigned doctor" regarding his medical treatment. (Id.) A few weeks later, a medical auditor, Dr. Cohen, wrote defendant Zwillinger, on June 26, 1992, informing him of "several problems with [plaintiff's] access to speciality [specialty] care" and forwarded the letter to the Legal Aid Society and an Assistant Attorney General. (Am. Compl. Ex. A, Letter from Cohen to Zwillinger of 6/26/92 at 1.) Dr. Cohen indicated that two recommendations had not been followed—an MRI of plaintiff's spine requested on March 3, 1991, and a neurosurgical consultation requested on March 5, 1992. (Id.) Dr. Cohen additionally noted that medication recommended by a neurologist on April 16, 1992 was not ordered by the facility staff for two weeks. (Id.) Two and one half months later, on September 11, 1992, an MRI of the lumbar spine was taken and showed mild to moderate spondylosis changes at the L1–L2 level as well as moderate degenerative facet joint changes at the L4–L5 and L5–S1 levels. (Koenigsmann Decl. Ex. B at 1117.) No definite disc herniations or significant canal stenosis—the narrowing of the vertebral canal—was noted. (Id. at 1107.) Veloz alleges that the pain medication recommended by a neurologist was never ordered (Am.Compl. ¶ IV); however, Dr. Cohen's letter indicated that

---

**6.** The C1 through C7 symbols represent the seven cervical vertebrae (the neck), the L1 through L5 symbols represent the five lumbar vertebrae (the lower back), and the S1 through S5 represent the sacral vertebrae (below the lower back). Dorland's Illustrated Medical Dictionary 1958 (29th ed.2000).

the medication was ordered after a two week delay.

Two and one half years later, on March 30, 1995, a CT scan of plaintiff's lumbar spine indicated disc bulge at the L4–L5 level and degenerative disease at the facet joints of L4–L5 and L5–S1. (Koenigsmann Decl. Ex. B at 618.) There was no evidence of herniation or stenosis. (*Id.*) The following June, plaintiff's cervical spine was examined by X-ray which showed moderately severe degenerative discogenic [7] changes at the C6–C7 levels and mild to moderate degenerative cervical spondylosis at the C4–C7 levels, with a greater showing at the C6 and C7 levels. (*Id.* at 1122.) That November, Dr. Fein referred Veloz to Mid–Hudson Radiology for an MRI of the cervical spine, which revealed degenerative changes of the cervical spine most marked at C6–C7, small ventral ridge extending from C4–C5 and C6–C7, most marked at C4–C5 level and compatible with disc bulges, but no evidence of spinal cord compression. (*Id.* at 1120–21) The following year on March 13, 1997, Dr. Fein referred plaintiff to Dr. Neal R. Dunkelman to rule out cervical radiculopathy, a condition affecting the cervical nerve roots. (*Id.* at 960–61.) Dr. Dunkelman found no evidence of radiculopathy or neuropathy. (*Id.*) In January of 1998, after lifting a bucket of water, plaintiff complained of acute lower back pain radiating to both thighs, being unable to walk or stand up straight, and in need of a wheelchair. (*Id.* at 866, 933.) The request for a wheelchair was denied. (*Id.*) A February 10, 1998 X-ray of plaintiff's lumbar spine indicated degenerative spondylosis and mild degenerative discogenic changes at the L4 to S1 levels. (*Id.* at 1074.) There was no indica-

tion of compression deformity, bone destruction, or S1 joint abnormality. (*Id.*)

Some time prior to February 24, 1998, plaintiff obtained access to a wheelchair as he was seen by a doctor on that date in a wheelchair. (*Id.* at 916.) Due to plaintiff's lumbosacral strain and spasm, he was seen by a consultant on both February 24 and March 24 due to complaints of pain "radiating to knees" and "radiating to thighs." (*Id.* at 924, 916.) An MRI of the lumbarsacral spine taken on April 20, 1998, showed degenerative changes at the L3–L4 and L4–L5 levels and signal changes in the right side of the L1 vertebral body warranting further testing. (*Id.* at 1077.) Mid–Hudson Radiology made specific recommendations to be followed before plaintiff's next exam. (*Id.* at 1087.) On June 1, 1998, in a letter from Mid–Hudson Radiology, a Dr. Chudow wrote Dr. Fein noting that the testing recommendations given to Dr. Fein on April 20, 1998 were not followed. (*Id.*) The June MRI taken by Mid–Hudson Radiology indicated the same abnormal area in the L1 vertebral body that showed in the April MRI. The same findings were indicated as on the prior exam in the L3–L4 and L4–L5 levels. (*Id.*) Additionally, at the L2–L3 level there appeared to be a small disc herniation and a bulging disc at the L4–L5 level. (*Id.*) Dr. Chudow requested that his recommendations be followed in the future because his insight into plaintiff's condition was limited by the failure to follow his recommendations in the past. (*Id.*)

The next month, Veloz was referred to orthopedics because of his continued pain. (*Id.* at 1085.) Approximately two weeks later, the orthopedic clinic recommended that Veloz have a spine consultation with defendant Dr. Galeno. (*Id.*) On August 4,

---

**7.** Discogenic changes are those "caused by derangement of an intervertebral disk." Dor-land's 510.

1998, plaintiff was referred to a spine specialist and the urgency of care was downgraded from a designation of "soon" to one of "routine." (*Id.*) Over two months later, in October, 1998, Veloz was seen by Dr. Galeno who stated in his consultation report that he was still awaiting plaintiff's decision on surgery. (*Id.* at 841.) This document constitutes the first indication that Veloz was considering surgery. On December 21, 1998, Dr. Galeno reported that plaintiff decided to have surgery and that he would recommend a laminectomy. (*Id.* at 839.) Surgery was scheduled for March 2, 1999. The record does not indicate whether Dr. Chudow's April 20, 1998 recommendations were followed prior to surgery. (*See id.* at 1077.)

The surgery—a bilateral lumbar laminectomy at L4 and L5, disc excision at L4–L5 and nerve root decompression at L5—took place as scheduled and was performed by Dr. Galeno. (Defs.' Mem. L. at 5.) By March 7, plaintiff was reported to be in stable condition, and an attending physician shortly thereafter recommended Veloz discontinue the use of his wheelchair because his motor capabilities were normal. (Koenigsmann Decl. at 1058, 834.) Veloz continued to use his wheelchair, however and complained that his left foot and knee and hip "hurt." (*Id.* at 1052.) By the beginning of June, plaintiff's wheelchair was removed, but three days later he was allowed to use the wheelchair again. (*Id.* at 1051.) On July 15, 1999, plaintiff was referred to physical therapy after complaining about pain, mobility, and frequent falling. (*Id.* at 1142.) The August 3, 1999 consultation report from physical therapy indicated that although it was unclear whether plaintiff's complaints regarding his left lower extremity were justified,

the consulting physician recommended an MRI of the lumbosacral spine. (*Id.*) The subsequent MRI taken at White Plains Radiology Associates indicated enhanced inflammatory changes surrounding the sac but no recurrent disc herniation, and minimal disc bulge of the L5–S1, and the L3–L4. (*Id.* at 1067–68.) No spinal stenosis was noted. (*Id.*) Veloz was then referred to neurology after reporting he could not walk or move his left lower extremity. (*Id.* at 1106.)

A November 3, 1999 consultant's report recommended that Veloz undergo an EMG of both lower extremities to determine whether his complaints regarding his lower extremity pain was either "malingering" or polyradiculopathy, a disease targeting several spinal nerve roots. (*Id.* at 1106.) The subsequent EMG showed evidence of acute S1 radiculopathy on the "right." (*Id.* at 1107–08.) It also suggested mild left tarsal tunnel.[8] (*Id.*) Nearly one year later, in November, 2001, after plaintiff requested placement in the Unit for Physically Disabled because of urine and bowel incontinence, as well as being wheelchair bound, Dr. Fein ordered a reevaluation of his condition. (*Id.* at 122.)

The evaluator noted that plaintiff claimed to be incontinent since 1999 due to the spinal surgery, and concluded that his condition was caused by either a medical condition or malingering and suggested specific tests, including an MRI and urodynamic studies to understand the incontinence. (*Id.*) The following April, a lumbar puncture of the L4–L5 level to determine the cause of plaintiff's pain and incontinence was complicated by Veloz moving during the needle positioning. Thus, repeat neurological evaluation was recom-

---

**8.** Tarsal tunnel refers to the tarsus, which is in the region between the foot and the leg.

Dorland's 1789.

mended and, if needed, an MRI. (*Id.* at 101–102.)

Veloz states that following the March 2, 1999 surgery he has been unable to walk due to "no feeling" in his left leg and "horrible pain" in his right leg; he suffers from "wetting and defecating on his cloth and on the bed, no feeling in his genital parts, and no feeling in his buttock." (Am. Compl.¶ IV.) He alleges he only received twelve adult diapers per week in Green Haven. (*Id.* ¶ IV–A.)

B. *Denial of pain medication as deliberate indifference to medical needs*

▮▮▮▮ Veloz contends that his medical providers failed to provide him medication to manage his back pain and that this denial was in deliberate indifference to his immediate serious medical needs. That allegation is essentially a disagreement with his medical providers' decision not to prescribe stronger pain medication than Tylenol rather than a claim that medical attention was denied entirely. While prisoners have a right to medical care, they do not have a right to chose a specific type of treatment. *See Grant v. Burroughs,* No. 96 Civ. 2753, 2000 WL 1277592, at *5 (S.D.N.Y. Sept. 8, 2000) (prisoner denied pain medication does not have a constitutional right to treatment of his choice). Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment. *See Wandell v. Koenigsmann,* No. 99 Civ. 8652, 2000 WL 1036030, at *5 (S.D.N.Y. July 27, 2000); *LaBounty v. Coombe,* No. 95 Civ. 2617, 1996 WL 684168, at *8 (S.D.N.Y. Nov. 26, 1996). The Eighth Amendment is not implicated by prisoners' complaints over the adequacy of the care they received when those claims amount to a disagreement over the appropriateness of a particular prescription plan. At most, such allegations may rise to the level of a medical malpractice claim, a type of action in which the Eighth Amendment is not implicated. *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 292.

Veloz claims that because he was unable to manage his pain for such an extended period of time, stronger medication was required and that by denying this request, defendants were deliberately indifferent to a serious medical need. However, he does not offer any evidence or allegations that stronger medication was not provided for any reason other than a medical decision. The decision to prescribe Tylenol for pain, situated within an overall treatment plan that included three X-rays, four MRIs, one CT scan, an EMG, and numerous consultations with specialists, does not state an Eighth Amendment claim. Accordingly, defendants' motion regarding this claim is granted.

C. *Serious medical need prior to 1999 surgery*

▮▮▮ Veloz fails to offer any evidence that he suffered from a serious medical need and that defendants were deliberately indifferent to his needs when treating his condition prior to the 1999 surgery. The parties do not dispute—and the medical logs support the conclusion—that from 1991 to 1999, Veloz complained about back pain to his medical providers, and received treatment for his spinal condition. Although he now states he sought surgery earlier than 1999, none of the specialists reviewing plaintiff's MRIs, X-rays or CAT Scans ever indicated that plaintiff needed surgery prior to 1999. There is no indication that his condition was so serious that it could have produced "death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66. His back pain was a chronic condition that did require attention, but

was not a "condition of urgency." *Id.* In fact, it was not until January 1998 that plaintiff strained his back while lifting a bucket of water and his condition began to deteriorate. Even with this deterioration, plaintiff did not require immediate surgery, and the decision to proceed with surgery was medically optional.

Furthermore, there is no evidence that defendants' treatment of plaintiff's condition was with deliberate indifference. Defendants responded to the complaints and provided treatment throughout the period of alleged deliberate indifference; Veloz simply disagrees with his treatment plan prior to surgery. There is no evidence that defendants knew of and disregarded "an excessive risk" to plaintiff's "health or safety." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979. Rather, they treated plaintiff's condition throughout the alleged period by performing multiple tests and references to specialists. As plaintiff fails to allege that defendants were deliberately indifferent to a serious medical need, defendants' motion with respect to all medical claims from 1991 to March of 1999 is granted.

### D. *Deliberate indifference in performing plaintiff's spine operation*

■ Veloz alleges that Dr. Galeno performed his spinal surgery "without skill" and that it caused serious complications. He supports this claim with two allegations: that another inmate on whom Dr. Galeno operated died after surgery, and that because Veloz suffered complications after the surgery, the surgery caused those complications. Even liberally reading plaintiff's contentions, his allegations fail to satisfy the Eighth Amendment deliberate indifference standard.

The medical evidence does not support the contention that the surgery caused the complications of which plaintiff complains, namely, incontinence and back pain. He provides absolutely no evidence connecting his condition subsequent to the surgery with the surgery itself. Simply stating that the surgery must have caused the condition since the condition did not exist prior to surgery fails to attribute unconstitutional conduct to Dr. Galeno in performing the surgery. Even if Veloz presented any evidence to show that the surgery resulted in the complications, he offers no evidence that Dr. Galeno acted with the requisite culpable state of mind, the second prong of the deliberate indifference test. The only evidence he offers to support his contention that Dr. Galeno was deliberately indifferent to plaintiff's safety is the death of another inmate following a surgery performed by Dr. Galeno. This allegation falls significantly short to prove that Dr. Galeno's mind set was comparable to a culpable doctor who wishes harm to an inmate, disregards an excessive risk to inmate's health and safety, or has a total lack of concern for an inmate's welfare. *See Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979; *Hathaway*, 37 F.3d at 69. Indeed, the evidence supports the opposite conclusion that Dr. Galeno provided Veloz with adequate care since he informed him of the risks of surgery, received his consent to the surgery, and performed surgery that placed him in stable condition. There is simply no evidence that Dr. Galeno's performance caused the subsequent problems or that he performed the surgery with the requisite state of mind. Accordingly, defendants' motion with respect to all claims against this defendant is granted.

### E. *Deliberate indifference to plaintiff's medical treatment after his surgery*

■ Veloz alleges that defendants treated his medical problems after surgery with deliberate indifference until his transfer out of Green Haven in 2003. The

medical logs indicate that plaintiff and his primary providers disagreed on his treatment plan after his surgery, with his providers seeking to wean Veloz from using his wheelchair, and plaintiff continuing his complaints about serious back pain. What he fails to allege, or show any evidence to support, is that his disagreement with the treatment plan was more than just a difference of opinion. To claim that defendants acted with deliberate indifference when providing plaintiff with treatment, Veloz must allege that the treatment was more than just mere negligence, and that the prison doctors acted with complete disregard for his health or safety. *See Chance,* 143 F.3d at 702. Instead, the evidence shows that defendants treated plaintiff's condition during the alleged period of deliberate indifference with an MRI, an EMG, and a lumbar puncture. Veloz may disagree with the treatment he did receive, but such disagreements are not evidence of a violation of the Eighth Amendment. Thus, defendants' motion as it pertains to this claim is granted.

## V. *Discrimination in housing* [9]

### A. *Background*

For over three years, from 1999 until plaintiff was transferred to another facility in June of 2003, plaintiff requested placement in the Unit for the Physically Disabled because of his difficulty in using a manual wheelchair. (Am. Compl. ¶ IV–A at 5–6.) Due to the injuries sustained to his right wrist and his left shoulder, plaintiff alleges he was able to push the wheels of his wheelchair only with great difficulty. He further alleges that the block in which he was housed did not provide any help for disabled inmates and since he had difficulty getting around the prison in his wheelchair, he was unable to attend rehabilitation programs, church, the library, and an academy school. (*Id.* at 7.) Veloz alleges Koenigsmann was responsible for deciding who was placed in the UPD and denied Veloz placement in that specialized unit for discriminatory reasons on account of his disability and race. (Pl.'s Mem. L. at 9.)

### B. *ADA violation*

■■■ For a prisoner to succeed with an ADA Title II claim, he must first show that:

1) he is "a qualified individual with a disability"; and that

2) "by reason of such disability, he was excluded from participation in or denied the benefits of the services, programs, or activities" or "subject to discrimination,"

3) "by a public entity."

42 U.S.C. § 12131. A "qualified individual with a disability" under the ADA "means an individual with a disability who, with or without reasonable modifications to rules, policies or practices ... meets the essential eligibility requirements for the ... participation in programs or activities provided by a public entity." *Id.* § 12131(2). Plaintiff alleges that defendant Koenigsmann denied him access to the UPD because of his disability. Based on this record, Veloz fails to satisfy the first prong of the test, that he is a "qualified individual with a disability."

The UPD unit at Green Haven accommodates inmates who require 24 hour nursing care and thus cannot be housed in

---

9. Plaintiff also alleges that he was treated differently from other inmates in the treatment of his spinal condition on account of his race and national origin. (Pl.'s Aff. Supp. Ex. C at 1.) Even if plaintiff alleged that he exhausted this claim when exhausting his medical claim, there is no evidence that defendants treated him differently when providing him medical attention.

a normal cell. (Koenigsmann Decl. ¶¶ 5–6.) Plaintiff's primary physicians—Dr. Fein and Dr. Weinstein—never recommended plaintiff move to the UPD "because plaintiff's condition did not prevent him from engaging in activities of daily living ... such that special accommodations not available in general population [were] needed." (*Id.*) Veloz fails to allege any evidence to counter this assessment. Instead, the evidence uniformly supports the conclusion that he was not qualified for the UPD. (*Id.* ¶ 8.) As plaintiff must be qualified for the program from which he claims he was excluded, he fails to establish a violation of the first prong of the Title II ADA test. Accordingly, defendants' motion as it relates to this claim is granted.

### C. *Fourteenth Amendment violation*

Plaintiff also alleges that Koenigsmann denied him placement in the UPD on account of his race and national origin in violation of the Equal Protection Clause of the Fourteenth Amendment. This allegation is not supported by any evidence of discriminatory motive on the part of Koenigsmann. Veloz's allegations are conclusory and vague and fail to provide sufficient facts to sustain an equal protection claim under section 1983. *See Neitzke v. Williams,* 490 U.S. 319, 325, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987); *see also Fine v. City of New York,* 529 F.2d 70, 73 (2d Cir.1975). The evidence uniformly supports the conclusion that Koenigsmann's decision was motivated solely by medical recommendations given by plaintiff's primary physicians. There is no evidence of a discriminatory motive on the part of Koenigsmann. Thus, the motion as it pertains to the claims against Koenigsmann regarding discrimination is granted.

### CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 is granted as to all claims and all defendants. Plaintiff's claims regarding his spinal condition, his placement in the UPD, his injury to his right wrist, his injury to his left shoulder, his placement in a cell with a black water leak, his transfer to the prison gym for an extended period of time on two separate occasions, and his denial to the Honor Block, are dismissed with prejudice. The Clerk of Court is directed to enter judgment dismissing the complaint as against all defendants.

SO ORDERED.