**Julio Isley SMITH, Plaintiff,**

v.

**C.F. KELLY, Jr., Captain, Great Meadow Corr. Facility; and James Levine, Prison Guard, Great Meadow Corr. Facility,[1] Defendants.**

No. 9:06–CV–0505 (GTS/ATB).

United States District Court,
N.D. New York.

Oct. 30, 2013.

---

1. At the hearing in this action on September 19, 2013, defense counsel represented to the Court that the name of Defendant "Levine" is actually spelled "Leavens." (Hrg. Tr. at 3.) This representation is consistent with the Acknowledgment of Service filed in this action on February 26, 2007. (Dkt. No. 17, at 2.) As a result, the Clerk of the Court is directed to amend the docket sheet accordingly.

Martin A. Lynn, Esq., Lynn Law Firm, Syracuse, NY, Pro Bono Trial Counsel for Plaintiff.

James Seamon, Esq., Assistant Attorney General, Eric T. Schneiderman, Attorney General for the State of New York, Albany, NY, for Defendants.

### DECISION and ORDER

GLENN T. SUDDABY, District Judge.

Currently before the Court is a prisoner civil rights action filed by Julio Isley Smith ("Plaintiff") asserting a claim of retaliation against Great Meadow Correctional Facility Captain C.F. Kelly and Prison Guard James Levine ("Defendants") pursuant to the First Amendment and 42 U.S.C. § 1983, alleging that, because Plaintiff sent a written "racial assault charge" to the Office of the New York State Inspector General on February 27, 2006 (complaining that a nonparty correctional officer assaulted another inmate earlier that day), Kelly placed him on a "72 hour investigation" on March 15, 2006, Kelly and Levine transferred him to Auburn Correctional Facility on March 16, 2006, and Levine told the guards at Auburn Correctional Facility that the transfer was punishment for complaining, which caused Plaintiff to be transferred to a restrictive unit within Auburn Correctional Facility ("Auburn C.F."). (Dkt. No. 10; Dkt. No. 114.) On September 19, 2013, the Court held an evidentiary hearing regarding Defendants' affirmative defense that Plaintiff failed to exhaust his available administrative remedies before filing this action, as required by the Prison Litigation Reform Act, before filing this action on April 17, 2006.[2] At the two-and-a-half-hour-long hearing, documentary evidence was admitted, and testimony was taken of Plaintiff as well as of Defendants' three witness—Auburn C.F. Sergeant Michael Murray, Auburn C.F. Inmate Grievance Supervisor Sheryl Parmiter, and New York State Department of Corrections and Community Supervision Inmate Grievance Program Director Karen Bellamy—whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a

---

**2.** Although Plaintiff's original Complaint was docketed on April 25, 2006, it is dated (and thus deemed "filed" pursuant to the Prison Mailbox Rule) April 17, 2006. (Dkt. No. 1, at 10; Hrg. Tr. at 80.) *See Self v. LaValley*, 10–CV–1463, 2013 WL 1294448, at *3, n. 8 (N.D.N.Y. March 27, 2013) (Suddaby, J.).

written decision would follow. This is that written decision. For the reasons set forth below, Plaintiff's ⸸Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

## I. RELEVANT LEGAL STANDARD

▮▮▮ The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524–25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo*, 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a contro-

versy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford*, 548 U.S. at 89, 126 S.Ct. 2378. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532, 122 S.Ct. 983.

In accordance with the PLRA, the New York State Department of Corrections and Community Supervision ("DOCCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y:C.R.R. §§ 701.5, 701.6(g), 701.7.[3] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[4] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superinten-

---

3. *See also Murray v. Palmer*, 03–CV–1010, 2010 WL 1235591, at *1 & n. 1 (N.D.N.Y. March 31, 2010) [citation omitted].

4. The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was

instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

dent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house" (by the Inspector General's Office) or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

■ It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[5] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can—and must—be appealed to the next level, including CORC, to complete the grievance process.[6] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number.[7] After carefully reviewing this case law, the Court finds that the weight of authority (and better-reasoned authority) answers this question in the affirmative.[8] The

---

**5.** *See Murray v. Palmer,* 03–CV–1010, 2010 WL 1235591, at *2 & n. 3 (N.D.N.Y. March 31, 2010) (citing *Groves v. Knight,* 05–CV–0183, Decision and Order at 3 [N.D.N.Y. filed Aug. 4, 2009], an appeal from which was subsequently dismissed as frivolous, *see Groves v. Knight,* No. 09–3641, Mandate [2d Cir. filed Jan. 15, 2010].)

**6.** 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *see also Murray,* 2010 WL 1235591, at *2 & n. 4 [collecting cases].

**7.** *Murray,* 2010 WL 1235591, at *2 & n. 5 [citing cases].

**8.** *See, e.g., Rosado v. Fessetto,* 09–CV–0067, 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010) (Baxter, M.J.) ("Courts have consistently held . . . that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *adopted by* 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010) (Hurd, J.); *Murray v. Palmer,* 03–CV–1010, 2008 WL 2522324, at *15, *18 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.) ("[E]ven if Great Meadow C.F. did not . . . have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level."), *accord, Midalgo v. Bass,* 03–CV–1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept. 26, 2006) (Mordue, C.J., adopting Report–Recommendation of Treece,

Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), and the plaintiff adequately describes the failure to process the grievance, there is something for the superintendent to review.

It is also important to note that DOCCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 7 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

"An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the

M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06–CV–0420, 2009 WL 2163214, at \*3, \*6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available where his grievance of March 20, 2004, was not assigned a grievance number); *Wesley v. Hardy,* 05–CV–6492, 2006 WL 3898199, at \*4 (S.D.N.Y. Dec. 12, 2006) ("If a prisoner submits a grievance and receives no response, he cannot be considered to have been actively obstructed or frustrated, as he is free to appeal to the next level of review."), *accord, Walters v. Carpenter,* 2004 WL 1403301, at \*3 (S.D.N.Y. June 22, 2004); *Veloz v. New York,* 339 F.Supp.2d 505, 515–16 (S.D.N.Y.2004) (rejecting inmate's argument that prison's grievance procedure had been rendered unavailable by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *Hernandez v. Coffey,* 99–CV–11615, 2003 WL 22241431, at \*4 (S.D.N.Y. Sept. 29, 2003) (rejecting plaintiff's argument that he could not have exhausted because he never received a grievance number, finding he could nonetheless have appealed any such non-response to the next level); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y. 2002) ("Had plaintiff utilized this procedure, any failure by Artuz to render a decision on his matter within twelve working days could have been appealed to Albany, thus completing the grievance cycle and exhausting his remedies in a matter of weeks."), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) ("[P]laintiff now argues in his opposition brief that he filed a grievance in November 1999 and did not receive a response.... Plaintiff's argument that he is excused because defendants failed to act with respect to the grievance is unpersuasive. Plaintiff could have and should have appealed the grievance in accordance with grievance procedures."); *Waters v. Schneider,* 01–CV–5217, 2002 WL 727025, at \*2 (S.D.N.Y. Apr. 23, 2002) ("Waters alleges that he attempted to file a grievance with the Inmate Grievance Resolution Committee ... in April 2001 but never received a response.... In either case, it is undisputed that Waters did not pursue the available appeals within the prison grievance system."); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding . . . is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

■ Generally, if a prisoner has failed to properly follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies, and his claims are subject to dismissal. *Woodford*, 548 U.S. at 93, 126 S.Ct. 2378; *Porter*, 534 U.S. at 524, 122 S.Ct. 983; *Ruggiero v. County of Orange*, 467 F.3d 170, 175 (2d Cir.2006). However, a plaintiff's failure to exhaust does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero*, 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). Sec-

ond, if those remedies were available, "the court should . . . inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it . . . or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

■ With regard to this third inquiry, the Court notes that, *under certain circumstances*, an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding*. *Giano v. Goord*, 380 F.3d 670, 678–79 (2d Cir.2004); *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir.2004).[9] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[10] *and* (2)

---

9. The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford*, the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a Section 1983 action in federal court. *Woodford*, 548 U.S. at 93, 126 S.Ct. 2378. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance*

*with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88–103, 126 S.Ct. 2378 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano–Testman* line of cases.

10. *Giano*, 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief

the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[11] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCCS regulations governing the grievability of his claim, (b) the inmate was specifically informed that the claim in question was grievable, (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC, (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion, and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[12] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim, and/or (b) the inmate did not appeal his disciplinary hearing conviction.[13]

 Finally, two additional points bear mentioning regarding exhaustion hearings. First, the Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not entitled to a jury trial on disputed factual issues relating to his exhaustion of administrative remedies; rather, PLRA exhaustion is a matter of judicial administration. *Messa v. Goord*, 652 F.3d 305, 308–10 (2d Cir.2011). Second, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies.[14] However, once a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then "counter" the defendant's assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [15] As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it.

## II. ANALYSIS

As an initial matter, the Court finds that, before filing this action on April 17, 2006, Plaintiff failed to follow each of the required three steps of the grievance procedure described above in Part I of this Decision and Order. In making this finding, the Court relies on the following evidence: (1) Plaintiff's verified Complaint (Dkt. No. 1, at ¶¶ 4.a., 4.b., 4.c.); (2) the Hearing Exhibits including Exhibits D–10, D–11, D–17, D–18, D–19, P–10–a, and P–

---

that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696–98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

11. *Testman,* 380 F.3d at 696–98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "af-

ford[ing] corrections officials time and opportunity to address complaints internally"); *see also Murray,* 2010 WL 1235591, at *3 & n. 9 [citing cases].

12. *Murray,* 2010 WL 1235591, at *3 & nn. 10–14 [citing cases].

13. *Id.* at *3 & nn. 15–16 [citing cases].

14. *Id.* at *4 [citation omitted].

15. *Id.* at *4 & n. 17 [citing cases].

10–b; (3) the hearing testimony of Sergeant Murray (Hrg. Tr. at 7–17); (4) the hearing testimony of Inmate Grievance Supervisor Parmiter (*id.* at 18–56); (5) the hearing testimony of Inmate Grievance Program Director Bellamy (*id.* at 56–70); and (6) the hearing testimony of Plaintiff (*id.* at 71–93).

 The Court notes that there is no exhaustion where an inmate complains directly to the Inspector General (i.e., instead of complaining to the superintendent and having the complaint referred to the Inspector General pursuant to 7 N.Y.C.R.R. § 701.8[d]), the Inspector General renders a finding of unsubstantiation, and the inmate fails to appeal that finding to CORC.[16]

As a result, the Court proceeds to the three-part inquiry established by the Second Circuit for when a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See, supra,* Part I of this Decision and Order.

## A. Availability of Administrative Remedies

After carefully considering the evidence submitted at the hearing, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following six reasons.

 First, Hearing Exhibits D–8 and D–9 (containing copies of the version of Directive 4040 that was in effect at the time in question) mandate the existence of a grievance program at Auburn C.F. during the time in question. (*See* Hrg. Exs. D–8, D–9.) Second, at the hearing on September 19, 2013, Sergeant Murray and Inmate Grievance Supervisor Parmiter testified credibly that there was a working grievance program at Auburn C.F. during the time in question, of which inmates at Auburn C.F. (including Plaintiff) were aware (including through an orientation program, the law library, and grievance clerks). (*See, e.g.,* Hrg. Tr. at 31–33, 58.) Third, in his verified Complaint, Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at [his place of present confinement, i.e., Auburn C.F.]." (Dkt. No. 1, at ¶ 4.a.) Fourth, the relevant portions of Plaintiff's hearing testimony acknowledge that there was a working grievance program at Auburn C.F. during the time in question, and

**16.** *See, e.g., Stephenson v. Dunford,* 320 F.Supp.2d 44, 46, 52 (W.D.N.Y.2004) finding no exhaustion where inmate complains directly to Inspector General, Inspector General renders finding of unsubstantiation, and inmate fails to appeal finding to CORC), *vacated on other grounds,* 139 Fed.Appx. 311 (2d Cir. 2005); *accord, Johnson v. Fernandez,* 09–CV–0626, 2011 WL 7629513, at *5 (N.D.N.Y. March 1, 2011) (Baxter, M.J.), *adopted by* 2012 WL 1033652 (N.D.N.Y. Mar. 27, 2012) (Scullin, J.); *Jacoby v. Phelix,* 07–CV–0872, 2010 WL 1839299, at *8–9 & n. 15 (N.D.N.Y. March 31, 2010) (Baxter, M.J.), *adopted by* 2010 WL 1839264 (N.D.N.Y. May 06, 2010) (Hurd, J.); *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 303–04 (W.D.N.Y.2004); *McNair v. Jones,* 01–CV–3253, 2002 WL 31082948 at *4, 8 (S.D.N.Y. Sept. 18, 2002);

*Houze v. Segarra,* 217 F.Supp.2d 394, 395–96 (S.D.N.Y.2002); *Grey v. Sparhawk,* 99–CV–9871, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000); *cf. Ortiz v. Skinner,* 00–CV–07220, 2004 WL 2091994, at *1–2 (W.D.N.Y. Sept. 16, 2004) ("Director Eagen explains that 'if an inmate or someone on the inmate's behalf complains to the Office of the Inspector General, but the inmate does not file a grievance, the matter is never filed as a grievance and it cannot be appealed to CORC. Of course, the inmate can do both. However, if the inmate chooses to submit a complaint to the Office of the Inspector General and not to file a grievance, then the procedures set forth in Part 701 of Title 7 NYCRR and Directive # 4040 have been completely bypassed, and the inmate has not availed himself or herself of the IGP.' ...").

that he had filed more than 40 grievances before the time in question. (*See* Hrg. Tr. at 63, 74–76, 79–80; Hrg. Ex. D–11.) Fifth, while Plaintiff claims that he "had not been made aware of the procedures for filing a formal complaint against the facility's superintendent" during the time in question, the Court finds that claim to be both incredible and immaterial for the reasons set forth below in Part II.C.2. of this Decision and Order. Sixth and finally, while Plaintiff claims that an "IGRC's supervisor" told him that a new prisoner does not file a grievance at Auburn C.F. if it pertains to the prisoner's previous facility, the Court finds that claim to be both incredible and immaterial for the reasons set forth below in Part II.C.3. of this Decision and Order.

## B. Forfeiture/Estoppel

After carefully considering the evidence submitted at the hearing, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or that Defendants are estopped from raising the defense by taking actions that inhibited Plaintiff's exhaustion of remedies.

With regard to the forfeiture issue, Defendant's Answer timely asserted this affirmative defense, and Plaintiff's counsel made no argument regarding forfeiture at the hearing. (Dkt. No. 34, at 3; *see generally* Hr. Tr.)

 With regard to the estoppel issue, a defendant in a prisoner civil rights action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies (for purposes of the second part of the three-part inquiry established by the Second Circuit) based on the actions or inactions of *other* individuals.[17] Here, Plaintiff failed to offer sufficient credible evidence at the hearing that it was *Defendants* (as opposed to someone else) who purportedly inhibited Plaintiff from filing grievances during the time in question. (Hrg. Tr. at 71–93.) For example, while Defendant Kelly has acknowledged having recommended Plaintiff's transfer (*see* Hrg. Ex. P–6), Plaintiff has not persuaded the Court that, at some unidentified time, Kelly contacted one or more unidentified correctional officers at Auburn C.F. and somehow persuaded them to threaten and/or intimidate Plaintiff not to exhaust his administrative remedies (or even that it was those communications, as opposed to something else, that caused Plaintiff not to exhaust his administrative remedies). (*See id.; see also* Hrg. Tr. at 72, 78, 84–85, 94–95, 97.) Having observed Plaintiff's demeanor during the hearing, and noticed the vagueness of his testimony on the subject of Kelly's contact

---

17. *See, e.g., Murray,* 2010 WL 1235591, at *5 & n. 26 [collecting cases]; *accord, Bailey v. Fortier,* 09–CV–0742, 2013 WL 310306, at *2 (N.D.N.Y. Jan. 25, 2013) (Sharpe, C.J.); *Belile v. Griffin,* 11–CV–0092, 2013 WL 1776086, at *9 (N.D.N.Y. Feb. 12, 2013) (Peebles, M.J.), *adopted by* 2013 WL 1291720 (N.D.N.Y. March 27, 2013) (McAvoy, J.); *Thompson v. Bellevue Hosp.,* 09–CV–1038, 2011 WL 4369132, at *12 (N.D.N.Y. Aug. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4369125 (N.D.N.Y. Sep. 19, 2011) (Mordue, C.J.); *Calloway v. Grimshaw,* 09–CV–1354, 2011 WL 4345299, at *4 (N.D.N.Y. Aug. 10, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4345296 (N.D.N.Y. Sep. 15, 2011) (McAvoy, J.);

*McCloud v. Tureglio,* 07–CV–0650, 2008 WL 1772305, at *12 (N.D.N.Y. Apr. 15, 2008) (Report–Recommendation of Lowe, M.J., adopted by Mordue, C.J.); *Barad v. Comstock,* 03–CV–0736, 2005 WL 1579794, at *6 (W.D.N.Y. June 30, 2005). The Court finds that a contrary interpretation of the law would turn the definition of "estoppel" on its head, transforming it—in Orwellian fashion—into one infected by a notion of "vicarious estoppel." *See Black's Law Dictionary* at 629 (9th ed) (defining "estoppel" as "[a] bar that prevents one from asserting a claim or right that contradicts what one has said or done before. . . .").

with Auburn C.F., the Court finds that testimony to be incredible.[18]

Moreover, the Court finds that the recommendation of the transfer, in and of itself, did not inhibit Plaintiff from filing grievances during the time in question. Setting aside the fact that the recommendation required approval in order for the transfer to occur, Plaintiff (purportedly) filed grievances following his transfer. (*See, e.g.,* Hrg. Exs. P–10–b, D–17.) More importantly, again, having observed Plaintiff's demeanor during the hearing, the Court finds his testimony on the subject of causation to be incredible.

### C. Special Circumstances

Liberally construed, Plaintiff's original Complaint, hearing testimony and oral argument argue that the following four facts, either by themselves or combined, constitute special circumstances justifying his failure to properly exhaust his available administrative remedies before filing this action on April 17, 2006.

First, Plaintiff argues, through his transfer to Auburn C.F., his placement in S.H.U. and the remarks made to him by Auburn C.F. Captain John Rourke on March 17, 2006, he felt threatened to not fully grieve his retaliatory transfer and placement in S.H.U. (*See* Hrg. Tr. at 72–74, 78, 84–87, 90–91; Hrg. Ex. D–14, at ¶ 14.)

Second, Plaintiff argues, he "had not been made aware of the procedures for filing a formal complaint against the facility's superintendent." (*See* Dkt. No. 1, at ¶ 4.b.; Hrg. Tr. at 84.)

Third, Plaintiff argues, upon his admission to Auburn C.F., the "IGRC's supervisor" told him that a new prisoner does not file a grievance at Auburn C.F. if it pertains to the prisoner's previous facility, but that the new prisoner should file that grievance at his previous facility. (Hrg. Tr. at 88–89.)

Fourth and finally, Plaintiff argues, he has "substantially complied" with the grievance process. (Hrg. Tr. at 96–98.) More specifically, he argues that he submitted the following complaints regarding his claim of retaliatory transfer and placement in the Auburn C.F. Special Housing Unit ("S.H.U."): (1) his Inmate Grievance Complaint dated April 28, 2006, complaining of his retaliatory transfer and placement in the Auburn C.F. S.H.U. (*see* Hrg. Ex. P–10–b; Hrg. Tr. at 74–76, 79); (2) his complaint to the Inspector General's Office, dated June 2, 2006, complaining (buried in a single line of a three-page document) that "I wrote what I saw to several people and then they moved me out" (*see* Hrg. Ex. D–17); (3) his Inmate Grievance Complaint dated October 15, 2010, complaining of his retaliatory transfer and placement in the Auburn C.F. S.H.U. (*see* Hrg. Exs. P–10–a, P.–10–b; Hrg. Tr. at 76–78);[19] (4) his letter to the Auburn C.F. Deputy Superintendent of Program Services Thomas dated November 8, 2010, complaining that he had not received an acknowledgment of the receipt of his grievance of October 15, 2010 (*see* Hrg. Ex. P–10–a; Hrg. Tr. at 76–78); (5) his letter to Deputy Commissioner of Facilities Operations Lucien J. LeClaire dated

---

**18.** The Court notes that, at the hearing, Plaintiff admitted that, on March 17, 2006, Auburn C.F. Captain Rourke told him, "Listen, *I* had you sent up here [to the Auburn C.F. Special Housing Unit] until I had the chance to talk to you." (Hrg. Tr. at 85 [emphasis added]; *cf.* Hrg. Ex. D–14, at ¶ 14.)

**19.** The Court does not agree with Plaintiff's counsel that Plaintiff's *four-and-a-half-year* delay in filing his October 15, 2010, grievance regarding the retaliation alleged in this action merely presents "some timing issues." (Hrg. Tr. at 98.)

▮▮▮▮▮▮▮▮▮▮

November 9, 2010, complaining that his grievance of October 15, 2010, had not yet been acted on; and (6) his two letters to Auburn C.F. Inmate Grievance Supervisor Parmiter dated December 2, 2010, and January 6, 2011, complaining that his grievance of October 15, 2010, had not yet been acted on (*see* Hrg. Ex. P10–b; Hrg. Tr. at 76–78). Moreover, Plaintiff argues, he received a response from the highest of the three levels in the grievance process, i.e., the Central Office Review Committee, through his receipt of a letter of November 29, 2010, from Inmate Grievance Program Director Bellamy (*see* Hrg. Ex. P–10–a; Hrg. Tr. at 96–98).

### 1. Purported Threats and/or Intimidation

▮▮▮▮ . After carefully considering the evidence submitted at the hearing, the Court finds that this excuse does not constitute special circumstances justifying his failure to exhaust his available administrative remedies (either by itself or combined with the evidence discussed elsewhere in Part II.C. of this Decision and Order).

As explained above in Part II.B. of this Decision and Order, the Court finds that the transfer and placement in S.H.U. did not inhibit Plaintiff from filing grievances during the time in question. As for the transfer, Plaintiff's Amended Complaint reveals that, at some point before February 27, 2006, Plaintiff wrote to the superintendent of Great Meadows C.F. and actually *requested* a transfer (undermining his claim his transfer instilled in him a chilling fear). (Dkt. No. 10, at ¶ 13.) As for the placement in S.H.U., it appears Plaintiff's stay in S.H.U. lasted only one day. (*See* Hrg. Ex. D–14, at ¶¶ 13, 14; Hrg. Tr. at 90.) As for the remarks made by Captain Rourke on March 17, 2006, for the sake of brevity, the Court will not linger on the vague and general nature of those remarks or the fact that, within six weeks of hearing them, Plaintiff (purportedly) filed a grievance. (*See, e.g.,* Hrg. Tr. at 85; Hrg. Exs. P–10–b, D–17.) More important is the fact that, having observed Plaintiff's demeanor during the hearing, the Court finds his testimony on the subject of causation to be incredible.

### 2. Purported Lack of Awareness

▮▮▮▮ After carefully considering the evidence submitted at the hearing, the Court finds that this excuse does not constitute special circumstances justifying his failure to exhaust his available administrative remedies (either by itself or combined with the evidence discussed elsewhere in Part II.C. of this Decision and Order).

The lack of awareness asserted by Plaintiff is the lack of awareness of "the procedures for filing a formal complaint against the facility's superintendent." (*See* Dkt. No. 1, at ¶ 4.b.; Hrg. Tr. at 84.) However, neither Defendant Kelly nor Defendant Levine was a facility superintendent during the time in question. (Hrg. Tr. at 84.) As a result, the lack of awareness in question is completely immaterial to why Plaintiff did not exhaust his administrative remedies regarding the claim asserted in this action.

Moreover, at the hearing, Inmate Grievance Supervisor Parmiter, and Inmate Grievance Program Director Bellamy testified credibly that inmates at Auburn C.F. were informed of the grievance procedure at Auburn C.F. during the time in question (including through an orientation program). (*See, e.g.,* Hrg. Tr. at 31–32, 58.) Furthermore, the grievance procedure (which was set forth Hgr. Exs. D–8 and D–9) was readily available to Plaintiff (who considered himself to be a "prison litigator") through both the law library and grievance clerks. (*See* Hrg. Exs. D–8, D–9; Hrg. Tr. at 32–33, 79.) Indeed, at the hearing, Plaintiff admitted that he had filed more than 40 grievances before the

time in question. (*See* Hrg. Tr. at 63, 79–80; Hrg. Ex. D–11.) Based on these facts and Plaintiff's demeanor during the hearing, the Court finds his testimony on this (purported) lack of awareness to be incredible

### 3. Purported Misinformation

█ After carefully considering the evidence submitted at the hearing, the Court finds that this excuse does not constitute special circumstances justifying his failure to exhaust his available administrative remedies (either by itself or combined with the evidence discussed elsewhere in Part II.C. of this Decision and Order).

At the hearing, Plaintiff does not identify the name the "IGRC's supervisor" who purportedly told him that a new prisoner does not file a grievance at Auburn C.F. if it pertains to the prisoner's previous facility, nor does he specify the date, means or location of this purported communication. (Hrg. Tr. at 88–89.) Based on this fact and Plaintiff's demeanor during the hearing, the Court finds his testimony on the subject of the (purported) receipt of this misinformation to be incredible.

In any event, even if the Court believed that Plaintiff had received this misinformation, the Court would have difficulty believing that the misinformation would have persuaded an experienced "prisoner litigator" such as Plaintiff to disregard the plain language of the April 16, 2004, Revision to DOCCS Directive 4040, which expressly stated, *"The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility"* (*see*

Hrg. Ex. D–9 [emphasis in original]), which was followed at Auburn C.F. during the time in question (*see* Hrg. Tr. at 26–28, 59–60). Again, that Revision was both communicated and available to Plaintiff. (*See* Hrg. Tr. at 31–33, 58.) Furthermore, Plaintiff does not even argue that, in reliance on the alleged misinformation, he tried to file a grievance at Great Meadows C.F.[20]

### 4. Purported Substantial Compliance

As an initial matter, "substantial compliance" does not appear to be a fair characterization of the standard set forth in the third part of the three-part inquiry established by the Second Circuit. *See, supra,* Part I of this Decision and Order. Such a construction would appear to violate the PLRA.[21] It would also appear to violate *Woodford v. Ngo,* which held that PLRA exhaustion requires *proper* exhaustion. *Woodford v. Ngo,* 548 U.S. 81, 92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). In any event, Plaintiff's failures cannot be viewed as insubstantial noncompliance. *See, e.g., Wilkinson v. Banks,* 02–CV–0361, 2007 WL 2693636, at *10 (W.D.N.Y. Sept. 10, 2007) ("Wilkinson's failure to file his appeal with the Clerk should not be viewed as insubstantial noncompliance.").

Out of special solicitude to Plaintiff, the Court will liberally construe his special-circumstances argument as arguing that, when taken together with the three previously discussed excuses proffered by him, his (alleged) unsuccessful attempts to file a timely grievance and appeal the denial of

---

**20.** The Court notes that, even if Plaintiff had genuinely believed the misinformation, that fact would have had little materiality, because part of the alleged retaliation occurred at Auburn C.F. (enabling him to file a grievance there).

**21.** *See Thomas v. New York State DOCS,* 00–CV–7163, 2003 WL 22671540, at *3, n. 5

(S.D.N.Y. Nov. 10, 2003) ("Such parties are not then excused [from the PLRA's exhaustion requirement] despite their substantial compliance with the DOCS remedial program and their relative persistence."); *McCoy v. Goord,* 255 F.Supp.2d 233, 246 (S.D.N.Y.2003) ("The standard [under the PLRA] is not one of … substantial compliance.").

that grievance all the way to CORC justify his failure to comply with the administrative procedural requirements. After carefully considering the matter, the Court rejects this argument for the following three reasons.

First, the Court does not believe that Plaintiff ever submitted his Inmate Grievance Complaint dated April 28, 2006. In rendering this finding, the Court relies on the following: (1) the fact that Plaintiff's (purported) grievance contains no grievance number (Hrg. Ex. P–10–b); (2) Plaintiff's sworn statement that he never filed a grievance with either the IGRC or Superintendent at Auburn C.F. (Dkt. No. 1, at ¶¶ 4.b., 4.c.); (3) the absence of the grievance from DOCCS' records of Plaintiff's grievances (Hrg. Exs. D–10, D–11); (4) the Court's evaluation of Sergeant Murray' credibility during his hearing testimony (Hrg. Tr. at 7–17); (5) the Court's evaluation of Inmate Grievance Supervisor Parmiter's credibility during her hearing testimony (*id.* at 18–56); (6) the Court's evaluation of Inmate Grievance Program Director Bellamy's credibility during her hearing testimony (*id.* at 56–70); and (7) the Court's evaluation of Plaintiff's lack of credibility during his hearing testimony (*id.* at 71–93).

Second, none of the (alleged) grievances and complaints relied on by Plaintiff were dated within fourteen (14) calendar days of the transfer and placement in S.H.U. on March 16, 2006, as required by DOCCS Directive 4040. (Hrg. Exs. D–8, D–9.) Rather, those grievances and complaints were (allegedly)filed on the following three dates: April 28, 2006; June 2, 2006; and October 15, 2010. (Hrg. Exs. P–10–a, P–10–b, D–17.) Moreover, none of those grievances and complaints was either preceded or accompanied by an application to Auburn C.F. Inmate Grievance Supervisor Parmiter for an exception to the time limit based on mitigating circumstances (which is the procedure described above in Part I of this Decision and Order).

Granted, the submission of the Inmate Grievance Complaint dated October 15, 2010, was followed by letters to supervisors complaining that the grievance had not been acted on. (*See* Hrg. Ex. P–10–a, P–10–b.) However, those letters do not constitute complaints that an *application* for an extension of time was wrongfully denied. (Indeed, as explained in the preceding paragraph, there had been no such application.) Rather, those letters (which were addressed to Auburn C.F. Deputy Superintendent of Program Services Thomas, Deputy Commissioner of Facilities Operations LeClaire, and Auburn C.F. Inmate Grievance Supervisor Parmiter) complain that Plaintiff's Inmate Grievance Complaint of October 15, 2010, was never processed, essentially constituting an appeal from that decision. However, none of those letters was filed with the proper person (i.e., Auburn C.F. Superintendent). Even if they had been so filed, they could not achieve exhaustion, because, as explained by Inmate Grievance Supervisor Parmiter in her letter of November 12, 2010, Plaintiff's Inmate Grievance Complaint of October 15, 2010, was rejected for being more than four-and-a-half years late. (Hrg. Ex. P–10–b.) Nor could exhaustion have been achieved through the letter of November 29, 2010, from Inmate Grievance Program Director Bellamy, who did not address the merits of Plaintiff's grievance. (Hrg. Ex. P10–a.)

It would eviscerate the exhaustion requirement to deem an inmate to have exhausted his available administrative remedies where he files a grievance four-and-a-half years late (while litigation is pending), then skips the superintendent and appeals the rejection of his grievance (based on untimeliness) to CORC, which

never passes on the merits of his grievance. If exhaustion were permissible under such circumstances, every inmate could exhaust his available administrative remedies without fulfilling the functions of the exhaustion requirement: affording corrections officials the time and opportunity to quickly and economically correct its own mistakes internally, and producing a useful record for litigation, before allowing the initiation of a federal case. *See, supra,* Part I of this Decision and Order.

Third, none of the three grievances and complaints relied on by Plaintiff was filed before he filed his Complaint in this action on April 17, 2006. Moreover, while Plaintiff's (alleged) Inmate Grievance Complaint dated April 28, 2006, and letter to the Inspector General dated June 2, 2006, predate his Amended Complaint on December 1, 2006 (*see* Dkt. No. 10, at 8), Plaintiff did not complete the exhaustion process with regard to either of those documents. The (alleged) non-processing of the first document was never appealed (in a timely fashion or otherwise) to the Superintendent and then CORC. Furthermore, the second document was neither caused by a referral by the Superintendent nor followed by an appeal to CORC (again, in a timely fashion or otherwise). To characterize Inmate Grievance Program's letter of November 29, 2010 (which expressly regarded Plaintiff's Inmate Grievance Complaint dated October 15, 2010), as an affirmance of either of the two documents dated 2006 would make a mockery of the exhaustion process.

Simply stated, Plaintiff knew the procedure; he simply did not follow it.

**ACCORDINGLY,** it is

**ORDERED** that, pursuant to note 1 of this Decision and Order, the Clerk of the Court shall amend the caption of the docket sheet in this action to reflect that the last name of Defendant "Levine" is actually spelled "Leavens"; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 10) is **_DISMISSED in its entirety without prejudice_** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.